## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

THE EDGAR ASSOCIATION,     )

          )     Civil Case No.: _____

     Plaintiff,        )

          )

v.               )     **JURY TRIAL DEMANDED**

          )

HAMMOND SOFTWARE, INC., and  )

NICOLAS HAMMOND,      )

          )

     Defendants.     )

## COMPLAINT FOR DECLARATORY JUDGMENT

The EDGAR Association complains against Defendants Hammond Software, Inc., and Nicolas Hammond, upon personal knowledge of its own actions and public materials, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.     Some may associate the card game bridge with casual play in retirement homes.  But competitive bridge is serious business.  Its North American governing body, the American Contract Bridge League ("ACBL"), has over 165,000 members of all ages and organizes nationwide tournaments.  There is also a large community for online play, and the world's top players can earn close to a million dollars per year.  Competitive bridge is so serious, in fact, that one of the ACBL's significant duties is to detect and punish cheating.

1

2.      Bridge—a trick-taking card game generally played between two teams of two partners—is what is known as a game of "incomplete information."  If a player knew not only her own cards but also those held by her partner and opponents, she could in theory play perfectly.  But a player does not know her opponent's cards, and even a player's own partner is not permitted to share information—instead, a player must glean limited data from her partner's (and opponents') in-game choices.

3.      Partners can therefore achieve a major competitive advantage if they have a method of illicitly sharing information about each other's cards.  This opportunity has given rise to a number of major cheating scandals in recent years.  One even spawned a documentary about the rise and fall of bridge's "very own Michael Jordan."[1]  And as the popularity of online play has increased, so too has the level of undetected cheating, as there is no one to physically monitor online players.

4.      Though perhaps the attention to scandals has grown in recent years, cheating has always been a part of bridge.[2]  Accordingly, those for whom maintaining proper competition in the game is important have long worked to detect, prevent, and punish cheating.

---

[1] *See* Rich Tenorio, *How a Cheating Scandal Brought Down the Michael Jordan of Bridge*, Guardian (May 5, 2021, 5:00 AM EDT), https://www.theguardian.com/sport/2021/may/05/lotan-fisher-bridge-cheating-scandal-2015-documentary.

[2] *See, e.g.*, Raymond A. Sokolov, *No More Dirty Tricks*, N.Y Times (Dec. 1, 1974), https://www.nytimes.com/1974/12/01/archives/no-more-dirty-tricks.html.

5.     This case is about competing efforts to use data science and computing to stay one step ahead of cheaters.  Defendants claim, through two patents, a monopoly over the use of computers to analyze bridge players' behavior against a database of past performance and the related use of statistical techniques to detect anomalous play.

6.     The EDGAR Association would like to utilize its own proprietary cheating-detection software to assist the ACBL and other national bridge federations in their missions, but Defendants have impeded those efforts through their assertion of their purported rights.  Indeed, Defendants have made it clear through correspondence, their actions, and their public comments that they intend to sue the EDGAR Association for allegedly infringing Defendants' patents.  In truth, however, Defendants' patents are not valid—and even if they were, the EDGAR Association's technology is not infringing.  The EDGAR Association therefore seeks a declaration from this Court that Defendants have no right to obstruct its mission to maintain integrity in competitive bridge.

7.     More specifically, this is an action for a declaratory judgment of invalidity and noninfringement of U.S. Patent No. 11,014,005 ("'005 patent") and U.S. Patent No. 11,439,912 ("'912 patent") (collectively, "Patents-in-Suit") under the patent laws of the United States, Title 35 of the U.S. Code, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

8.     Plaintiff is the EDGAR Association, an Illinois not-for-profit corporation.  The EDGAR Association exists to foster competition in national and international bridge competitions.   "EDGAR" is an acronym for "Everyone Deserves a Game Above Reproach."

9.     Upon information and belief, Defendant Hammond Software, Inc. ("Hammond Software"), is a Georgia domestic profit corporation with its principal place of business located at 270 Willow Glade Pt. in Alpharetta, Georgia.

10.     Upon information and belief, Defendant Nicolas Hammond ("Mr. Hammond") resides and is domiciled at 270 Willow Glade Pt. in Alpharetta, Georgia.  Mr. Hammond is a citizen of Georgia.  Upon information and belief, Mr. Hammond is the sole employee of Hammond Software.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 2201(a) because this action arises under the patent laws of the United States, 35 U.S.C. § 100 *et seq.*, and seeks a declaration of the rights and legal relations among the parties.

12.     A definite and concrete, real and substantial, justiciable controversy exists between the EDGAR Association and Defendants, who have adverse legal interests relating to questions of invalidity and noninfringement of the Patents-in-

Suit.  A declaratory judgment that the Patents-in-Suit are either invalid or not infringed would conclusively resolve the relative rights of the parties.

13.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because both Defendants are residents of Georgia and both Defendants reside in this district.

### FACTUAL ALLEGATIONS

14.    The EDGAR Association owns the rights to the EDGAR technology, which analyzes data from competitive bridge games and creates reports that can be used to detect cheating.  The EDGAR technology was principally developed on a volunteer basis by Brian Platnick and Franco Baseggio, in association with A.J. Stephani.

15.    The EDGAR Association is the successor to Mr. Platnick, Mr. Baseggio, and Mr. Stephani's venture.  The activity that Defendants have labeled as infringing the Patents-in-Suit is now carried on by the EDGAR Association.

16.    As explained above, the rules of bridge impose limitations on information sharing between partners.  EDGAR analyzes player performance and issues reports that help to detect anomalous play suggesting a player has illicitly received information from his or her partner.

17.    In early 2022, Mr. Platnick and Mr. Baseggio presented a prototype of the EDGAR technology to the ACBL's board of directors.  The presentation was well received and negotiations began for the ACBL's use of the technology in its

cheating-detection operations.  On April 9, 2022, the EDGAR team announced that "EDGAR is currently being tested and refined," and that they "expect[ed] to place it in use in ACBL cases later this year."[3]

18.    On April 18, 2022, while negotiations with the ACBL regarding use of the EDGAR technology were ongoing, Defendants sent a cease-and-desist letter to Mr. Platnick, Mr. Baseggio, Mr. Stephani, and others involved in the negotiations.

19.    The cease-and-desist letter asserted both the '005 patent and the then-pending application that later issued as the '912 patent, and stated that continued use of the EDGAR technology—which Defendants labeled as "infringing software"— would constitute willful infringement of both patents.  The letter noted that Defendants were "prepared to enforce the [Patents-in-Suit]" and to "seek treble damages."  The letter further explained that if the recipients were unwilling to negotiate a license for the purportedly patented technology, Defendants would "be forced to involve the courts."

20.    Mr. Hammond has also publicly stated that the EDGAR technology infringes the Patents-in-Suit.  In reference to the ACBL's use of the EDGAR technology to detect cheating, Mr. Hammond posted an internet comment stating

---

[3] A.J. Stephani et al., *Introducing EDGAR*, Bridge Winners (Apr. 9, 2022), https://bridgewinners.com/article/view/introducing-edgar.

that ACBL had "stolen [his] idea."[4]  In the same thread, he accused Mr. Platnick and Mr. Baseggio by name of being part of the ACBL's "willful infringement."[5]

21.     Between approximately April 2022 and approximately April 2023, Mr. Platnick, Mr. Baseggio, and others involved in the EDGAR venture attempted to reach a resolution with Mr. Hammond, but the efforts were unsuccessful. Throughout, Mr. Hammond continued to assert the validity of the Patents-in-Suit and to label the EDGAR technology as infringing.  Direct negotiations ceased after Mr. Hammond continually refused to resolve the dispute.

22.     Mr. Hammond's continued allegations that the EDGAR technology infringes the Patents-in-Suit impedes and casts uncertainty on the EDGAR Association's ability to share its technology with potential partners in the bridge industry.

23.     On October 19, 2023, the EDGAR Association entered into an agreement with the ACBL, under which the ACBL will utilize the EDGAR technology to assist with the detection of cheating in bridge competitions.  The EDGAR Association will process data and generate reports on behalf of the ACBL and provide related advice to assist with the ACBL's efforts to detect and punish cheaters.

---

[4]  Nicolas Hammond, Comment to *Hall of Fame Admission Rescinded*, Bridge Winners (July 3, 2022), https://bridgewinners.com/article/view/hall-of-fame-admission-rescinded.

[5]  Nicolas Hammond, Comment to *Hall of Fame Admission Rescinded*, *supra* note 4 (July 1, 2022).

24.     Defendants have indicated their belief that the EDGAR Association's use of the EDGAR technology to process ACBL data will infringe on the Patents-in-Suit.  As a result, there is a substantial likelihood that suit against the EDGAR Association for infringement of the Patents-in-Suit is forthcoming.

## THE PATENTS-IN-SUIT

25.     Upon information and belief, Mr. Hammond is the owner of the '005 patent by assignment.  The face of the '005 patent lists Mr. Hammond as the sole named inventor and Hammond Software as the applicant.  The '005 patent is entitled "Detecting Cheating and Changes in Playing Ability in Partial Knowledge and Trick-Taking Games," and it issued on May 25, 2021.  The '005 patent allegedly claims priority to Provisional Application No. 62/641,221, which was filed on March 9, 2018.

26.     The '005 patent contains 20 claims, three of which are independent claims.  A true and correct copy of the '005 patent is attached to this Complaint as Exhibit A.

27.     Upon information and belief, Hammond Software is the owner of the '912 patent.  The face of the '912 patent lists Mr. Hammond as the sole named inventor and Hammond Software as the applicant.  The '912 patent is entitled "Detecting Cheating and Changes in Playing Ability in Partial Knowledge and Trick-Taking Games," and it issued on September 13, 2022.  The '912 patent

allegedly claims priority to Provisional Application No. 62/641,221, which was filed on March 9, 2018.

28.    The '912 patent contains 20 claims, three of which are independent claims.  The application that issued as the '912 patent is a continuation of the application that issued as the '005 patent.  A true and correct copy of the '912 patent is attached to this Complaint as Exhibit B.

29.    The '005 patent and the '912 patent purportedly claim methods, associated systems, and associated computer media for detecting cheating in the game of bridge.

30.    Independent Claim 1 of the '005 patent recites a "system" including a "computer-readable medium" and "a processor that executes . . . instructions to perform" the following:

> [1] acquiring board data for multiple events, the events including bridge games, wherein the board data corresponds to boards in the bridge games, and wherein the board data includes hand records, a table result, contract, and declarer from the respective bridge game;
>
> [2] for multiple of the boards in each event, determining performance values for a player of the respective board based on the board data and timing information, wherein the timing information conveys how long the player took to make a call or play a card during the event;
>
> [3] detecting, by the processor, a deviation by comparing the performance values from a first event against a threshold, wherein the threshold is based on at least one of past performance of known cheating players and optimal bridge behavior, wherein the optimal bridge behavior is based on performance values for non-cheating players from the multiple events; and

[4] alerting an administrative user for the first event regarding a likelihood of cheating when the deviation is detected, wherein the alert includes automatically sending an electronic message to the administrative user.

31.    Independent Claims 10 and 17 of the '005 patent recite a "method" and a "computer-readable medium including instructions," respectively, that comprise the same four steps as Claim 1.

32.    Claim 1 of the '912 patent recites a "system" including a "computer-readable medium" and "a processor that executes . . . instructions to perform" the following:

[1] acquiring board data for multiple events, the events including bridge games,
> wherein the board data corresponds to boards in the bridge games, and
> wherein the board data includes hand records, a table result, contract, and
> declarer from the respective bridge game;

[2] for multiple of the boards in each event, determining performance values for a player of the respective board based on the board data;

[3] detecting, by the processor, a deviation by comparing the performance values from a first event against a threshold, wherein the threshold is based on at least one of past performance of known cheating players and optimal bridge behavior, wherein the optimal bridge behavior is based on performance values for non-cheating players from the multiple events; and

[4] alerting an administrative user for the first event regarding a likelihood of cheating when the deviation is detected, wherein the alert includes automatically sending an electronic message to the administrative user.

33.     Independent Claims 10 and 17 of the '912 patent recite a "method" and a "computer-readable medium including instructions," respectively, that comprise the same four steps as Claim 1.

## COUNT 1
### (Declaratory Judgment of Invalidity of U.S. Patent No. 11,014,005)

34.     The foregoing paragraphs of this Complaint are repeated and realleged as if fully set forth herein.

35.     All claims of the '005 patent are invalid because each is directed to subject matter that is nonpatentable under 35 U.S.C. § 101.  In particular, each claim of the '005 patent is drawn to the abstract idea of detecting cheating in bridge by using a computer to compare players' performance to historical data.

36.     The Supreme Court has "long held that [35 U.S.C. § 101] contains an important implicit exception:  Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).  *Alice* prescribed a two-step process for determining whether a claim is patent eligible under Section 101.  First, a court determines whether the claim is "directed to a patent-ineligible concept."  *Id.* at 218.  If so, the court "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."

*Id.* at 221 (some internal quotation marks omitted) (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 72, 80 (2012)).

37.    "A telltale sign of abstraction is when the claimed functions are mental processes that can be performed in the human mind or using a pencil and paper." *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361–62 (Fed. Cir. 2023) (internal quotation marks omitted).  In the context of software-related claims, the abstract-idea analysis "often turns on whether the claims focus on the specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool." *Id.* at 1362–63 (internal quotation marks omitted).  Claims are abstract when they merely "seek[] to use computers as a tool" rather than recite "an improvement in computer capabilities." *Id.* at 1363.

38.    Under the first step of the *Alice* test, the '005 patent is a paradigmatic example of claims that are directed to an abstract idea.  For example, Claim 1 consists of looking how quickly the player plays, deciding whether she is a cheater by comparing her gameplay to historical performance of cheaters and non-cheaters, and alerting an administrator if cheating is detected.  Each of these elements is an intellectual step; none can be categorized as an improvement to computer technology.  The sole references to computers in the claim are the "non-transitory, computer-readable medium containing instructions" and the "processor that

executes the instructions"—classic examples of generic computer components that do not take the claim out of the realm of abstractness.

39.    Application of the second step of the *Alice* test demonstrates that the '005 claims do not contain an inventive concept that transforms the claimed abstract idea into patent-eligible subject matter.    Rather, they are directed to the implementation of long-understood abstract ideas and processes using an unspecified, generic computer.    But "generic computer components" are "insufficient to add an inventive concept to an otherwise abstract idea." *TLI Commc'ns LLC v. AV Auto., L.L.C. (In re TLI Commc'ns LLC Pat. Litig.)*, 823 F.3d 607, 614 (Fed. Cir. 2016).  Likewise, "the improved speed inherent with applying the abstract idea using a computer" is insufficient to establish inventiveness at *Alice*'s second step.  *Trinity Info*, 72 F.4th at 1366; *accord Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020) ("[C]laiming the improved speed or efficiency inherent with applying the abstract idea on a computer [i]s insufficient to render the claims patent eligible as an improvement to computer functionality." (internal quotation marks omitted)); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.").

40.    All claims of the '005 patent are invalid under 35 U.S.C. § 102 because, *inter alia*, upon information and belief, Mr. Hammond offered products practicing the '005 patent for sale in the bridge industry more than one year before March 9, 2018, including but not limited to offers for sale of the product BridgeScore+.

41.    All claims of the '005 patent are invalid under 35 U.S.C. § 103 because they recite nothing that would be nonobvious to a person of ordinary skill given the state of the prior art as of March 9, 2018, including but not limited to: Jeff Yan, *Security Design in Online Games*, published in 2003 as part of the Proceedings of the 19th Annual Computer Security Applications Conference; Jeff Yan, *Collusion Detection in Online Bridge*, published in 2010 as part of the Proceedings of the Twenty-Fourth AAAI Conference on Artificial Intelligence; Krists Zutis & Jesse Hoey, *Who's Counting?: Real-Time Blackjack Monitoring for Card Counting Detection*, published in 2009; Guy Haworth et al., *Performance and Prediction: Bayesian Modelling of Fallible Choice in Chess*, published in 2010 in *Advances in Computer Games*; Kenneth W. Regan et al., *Human and Computer Preferences at Chess*, published in 2014; and various disclosures by Stephen Pickett of REC Software Inc., who has sold BRidgeBRowser, software used for cheating detection in bridge, since 2001.

42.    All claims of the '005 patent are invalid because they are neither sufficiently enabled nor sufficiently described by the '005 patent's specification as

required by 35 U.S.C. § 112(a).   In particular, the specification fails to provide sufficient instruction on how to obtain the data used, how to store these data, what statistical techniques to use to determine player performance values using these data, or what statistical thresholds to use to avoid a level of false positives or false negatives that would render the detection system unusable.   Because of those deficiencies in the specification, a person of ordinary skill would not be able to make or use the claimed systems, methods, or media.

43.   As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

44.   A judicial declaration of invalidity is necessary and appropriate so that the EDGAR Association may ascertain its rights regarding the '005 patent.

## COUNT 2
### (Declaratory Judgment of Noninfringement of U.S. Patent No. 11,014,005)

45.   The foregoing paragraphs of this Complaint are repeated and realleged as if fully set forth herein.

46.   The EDGAR technology does not infringe and has not infringed any enforceable claim of the '005 patent, either literally or under the doctrine of equivalents.

47.   For example, each independent claim of the '005 patent recites "determining performance values for a player . . . based on . . . timing information."

The EDGAR technology does not collect, determine, or utilize timing information. Accordingly, the EDGAR technology does not meet at least this claim limitation.

48.    As another example, each independent claim of the '005 patent recites "detecting . . . a deviation by comparing the performance values from a first event against a threshold." The EDGAR technology does not detect deviations based on a "first event" and it does not "compar[e] . . . performance values . . . against a threshold." Accordingly, the EDGAR technology does not meet at least this claim limitation.

49.    As a further example, each independent claim of the '005 patent recites "alerting an administrative user . . . regarding a likelihood of cheating" by "automatically sending an electronic message" upon detecting a deviation. The EDGAR technology does not automatically alert any sort of user in any such way upon making any sort of detection. Accordingly, the EDGAR technology does not meet at least this claim limitation.

50.    As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

51.    A judicial declaration of noninfringement, either literally or under the doctrine of equivalents, is necessary and appropriate so that the EDGAR Association may ascertain its rights regarding the '005 patent.

## COUNT 3

### (Declaratory Judgment of Invalidity of U.S. Patent No. 11,439,912)

52.     The foregoing paragraphs of this Complaint are repeated and realleged as if fully set forth herein.

53.     All claims of the '912 patent are invalid because each is directed to subject matter that is nonpatentable under 35 U.S.C. § 101.  For abstractness purposes and application of the *Alice* test, Claim 1 of the '912 patent is no different from Claim 1 of the '005 patent.  It consists of examining how well the player is playing, deciding whether she is a cheater by comparing her gameplay to historical performance of cheaters and non-cheaters, and alerting an administrator if cheating is detected.  The sole references to technology in '912 patent claims are the "non-transitory, computer-readable medium containing instructions" and the "processor that executes the instructions," which are generic computer components.

54.     All claims of the '912 patent are invalid under 35 U.S.C. § 102 because, *inter alia*, upon information and belief, Mr. Hammond offered products practicing the '912 patent for sale in the bridge industry more than one year before March 9, 2018, including but not limited to offers for sale of the product BridgeScore+.

55.     All claims of the '912 patent are invalid under 35 U.S.C. § 103 because they recite nothing that would be nonobvious to a person of ordinary skill given the state of the prior art as of March 9, 2018, including but not limited to: Jeff Yan, *Security Design in Online Games*, published in 2003 as part of the Proceedings of

the 19th Annual Computer Security Applications Conference; Jeff Yan, *Collusion Detection in Online Bridge*, published in 2010 as part of the Proceedings of the Twenty-Fourth AAAI Conference on Artificial Intelligence; Krists Zutis & Jesse Hoey, *Who's Counting?: Real-Time Blackjack Monitoring for Card Counting Detection*, published in 2009; Guy Haworth et al., *Performance and Prediction: Bayesian Modelling of Fallible Choice in Chess*, published in 2010 in *Advances in Computer Games*; Kenneth W. Regan et al., *Human and Computer Preferences at Chess*, published in 2014; and various disclosures by Stephen Pickett of REC Software Inc., who has sold BRidgeBRowser, software used for cheating detection in bridge, since 2001.

56.    All claims of the '912 patent are invalid because they are neither sufficiently enabled nor sufficiently described by the '912 patent's specification as required by 35 U.S.C. § 112(a).  In particular, the specification fails to provide sufficient instruction on how to obtain the data used, how to store these data, what statistical techniques to use to determine player performance values using these data, or what statistical thresholds to use to avoid a level of false positives or false negatives that would render the detection system unusable.  Because of those deficiencies in the specification, a person of ordinary skill would not be able to make or use the claimed systems, methods, or media.

57.    As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

58.    A judicial declaration of invalidity is necessary and appropriate so that the EDGAR Association may ascertain its rights regarding the '912 patent.

## COUNT 4
**(Declaratory Judgment of Noninfringement of U.S. Patent No. 11,439,912)**

59.    The foregoing paragraphs of this Complaint are repeated and realleged as if fully set forth herein.

60.    The EDGAR technology does not infringe and has not infringed any enforceable claim of the '912 patent, either literally or under the doctrine of equivalents.

61.    For example, each independent claim of the '912 patent recites "detecting . . . a deviation by comparing the performance values from a first event against a threshold."  The EDGAR technology does not detect deviations based on a "first event" and it does not "compar[e] . . . performance values . . . against a threshold."  Accordingly, the EDGAR technology does not meet at least this claim limitation.

62.    As another example, each independent claim of the '912 patent recites "alerting an administrative user . . . regarding a likelihood of cheating" upon detecting a deviation.  As taught by the specification, the "alert[]" is an email or a

message on an application.  The EDGAR technology does not alert any sort of user in any such way upon making any sort of detection.  Accordingly, the EDGAR technology does not meet at least this claim limitation.

63.     As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

64.     A judicial declaration of non-infringement, either literally or under the doctrine of equivalents, is necessary and appropriate so that the EDGAR Association may ascertain its rights regarding the '912 patent.

## RESERVATION OF RIGHTS

65.     The EDGAR Association reserves the right to supplement with additional claims or defenses as discovery proceeds in this matter.

## PRAYER FOR RELIEF

66.     WHEREFORE, Plaintiff the EDGAR Association respectfully requests that this Court enter judgment in its favor against Defendants on all Counts and grant the following relief:

A.      A declaration that all claims of the Patents-in-Suit are invalid and void because each fails to comply with one or more of the conditions and requirements of the federal patent laws, including but not limited to those set forth in 35 U.S.C. §§ 101, 102, 103, and 112;

B.      A declaration that the EDGAR Association does not infringe and has

        not infringed any valid and enforceable claim of the Patents-in-Suit;

C.      A finding that this case is exceptional and a concomitant award of

        attorney fees pursuant to 28 U.S.C. § 1927, 35 U.S.C. § 285, and this

        Court's equitable powers; and

D.      Such other relief that this Court deems just and proper under the

        circumstances.

## **DEMAND FOR JURY TRIAL**

67.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff the

EDGAR Association hereby demands a trial by jury of all issues so triable in this

action.


Date:  October 30, 2023                       Respectfully submitted,


                                              */s/ Kurt Kastorf*
                                              Kurt Kastorf
                                              Ga. Bar No. 315315
                                              KASTORF LAW
                                              1387 Iverson St., Suite 100
                                              Atlanta, GA 30307
                                              (404) 900-0330
                                              kurt@kastorflaw.com

Louis Fogel[**]
Shaun M. Van Horn[**]
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 222-9350
lfogel@jenner.com
svanhorn@jenner.com

Adam G. Unikowsky[**]
Jonathan J. Marshall[**†]
JENNER & BLOCK LLP
1099 New York Ave., N.W.,
 Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com
jmarshall@jenner.com

[**] pro hac vice *application forthcoming*

[†] *Admission in the District of Columbia
pending; practicing under direct
supervision of members of the D.C. Bar*