IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE EDGAR ASSOCIATION,

    Plaintiff,

      v.

HAMMOND SOFTWARE, INC., *et al.*,

    Defendants.

CIVIL ACTION NO.
1:23-cv-04985-TRJ

## ORDER

This matter is before the Court on Plaintiff/Counterclaim-Defendant The EDGAR Association's ("EDGAR") motion to dismiss Defendant/Counterclaim-Plaintiff Hammond Software Inc.'s ("Hammond Software") counterclaim for failure to state a claim, and EDGAR's motion for judgment on the pleadings. (Doc. 52). Upon review and consideration, and with the benefit of oral argument, EDGAR's motions are **GRANTED**.

## BACKGROUND

This lawsuit concerns the validity (and, if valid, the potential infringement) of patents for a system used to detect cheating in bridge, "a trick-taking card game" that has over 165,000 professional members in the North American league. (Doc. 1 at ¶ 1). Like most games, cheating by players is a possibility. (*Id.*) EDGAR owns and developed technology, known as EDGAR, that detects cheating in bridge. (*Id.* at ¶¶ 14, 16). Defendant Nicolas Hammond is the founder and CEO of Hammond Software (collectively, the "Hammond Defendants"). (Doc. 25 at 25, ¶ 18). The

Hammond Defendants are the owners of two patents for bridge cheating technology. (Doc. 1 at ¶¶ 25, 27).

### A. The Patents-In-Suit and the History of the Patents

The two patents at issue in this case (the "Patents-In-Suit") are U.S. Patent No. 11,014,005 (the "'005 Patent") and U.S. Patent No. 11,439,912 (the "'912 Patent"). (Doc. 1-2; Doc. 1-3). Mr. Hammond owns the '005 Patent, titled "Detecting Cheating and Changes in Playing Ability in Partial Knowledge and Trick-Taking Games," issued on May 25, 2021. (Doc. 1 at ¶ 25). The '005 Patent contains 20 claims, three of which are independent (specifically, Claims 1, 10, and 17). (*Id.* at ¶ 26).

Hammond Software owns the '912 Patent, titled the same as the '005 Patent, issued on September 13, 2022. (*Id.* at ¶ 27). The application for the '912 Patent was filed on May 24, 2021, as U.S. Patent Application No. 17/328,080, and claims priority to U.S. Patent Application No. 16/299,105, which was filed on March 11, 2019, which claims priority to U.S. Provisional Patent Application No. 62/641,221, which was filed on March 9, 2018. (Doc. 25 at 25, ¶ 17). The patents claim methods, associated systems, and associated computer equipment for detecting cheating in bridge. (*Id.* at 12–13, ¶ 29).

Independent Claim 1 of the '912 Patent recites a "system" including a "computer-readable medium" and "a processor that executes . . . instructions to perform" the following:

> [1] acquiring board data for multiple events, the events including bridge games, wherein the board data corresponds to boards in the bridge games, and wherein the board data includes hand records, a table result, contract,

and declarer from the respective bridge game;

[2] for multiple of the boards in each event, determining performance values for a player of the respective board based on the board data;

[3] detecting, by the processor, a deviation by comparing the performance values from a first event against a threshold, wherein the threshold is based on at least one of past performance of known cheating players and optimal bridge behavior, wherein the optimal bridge behavior is based on performance values for non-cheating players from the multiple events; and

[4] alerting an administrative user for the first event regarding a likelihood of cheating when the deviation is detected, wherein the alert includes automatically sending an electronic message to the administrative user.

(Doc. 1 at ¶ 32). Claim 1 of the '005 Patent is identical except it contains a timing provision, meaning the method determines the player's performance value based, in part, on timing information, which "conveys how long the player took to make a call or play a card during the event." (*Id.* at ¶ 30). Claims 10 and 17, the other two independent claims, recite the same four steps found in Claim 1. (*Id.* at ¶¶ 31, 33).

## B. EDGAR's Complaint

According to its Complaint, EDGAR owns the rights to its EDGAR technology, which uses data analysis to create reports regarding potential cheating in bridge. (Doc. 1 at ¶¶ 14, 16). EDGAR stands for "Everyone Deserves a Game Above Reproach" and was principally developed by Counterclaim-Defendants Brian Platnick and Franco Basseggio, in association with Counterclaim-Defendant A.J. Stephani. (*Id.* at ¶¶ 8, 14). In early 2022, Mr. Platnick and Mr. Basseggio presented the prototype of the EDGAR technology to Counterclaim-Defendant The American Contract Bridge

3

League (the "ACBL"), the North American governing body of competitive bridge tournaments, which was "well received" and resulted in an agreement between EDGAR and the ACBL in October 2023. (*Id.* at ¶¶ 1, 17, 23). This agreement took place after Mr. Hammond sent the individual Counterclaim-Defendants (Mr. Platnick, Mr. Basseggio, and Mr. Stephani) a cease-and-desist letter asserting infringement of the Patents-In-Suit, posted public comments addressing the infringement and claiming the ACBL "stole" his ideas, and engaged in unsuccessful negotiations with those involved in the EDGAR venture. (*Id.* at ¶¶ 18–21).

On October 30, 2023, EDGAR filed a Complaint against the Hammond Defendants seeking declaratory judgment as to the Patents-In-Suit on the grounds that they are invalid and have not been infringed. (Doc. 1 at ¶ 7). EDGAR asserts that, through its two patents, the Hammond Defendants claim "a monopoly over the use of computers to analyze bridge players' behavior against a database of past performance and the related use of statistical techniques to detect anomalous play." (*Id.* at ¶ 5). EDGAR "seeks a declaration from this Court that [the Hammond Defendants] have no right to obstruct [EDGAR's] mission to maintain integrity in competitive bridge." (*Id.* at ¶ 6).

### C. Hammond Software's Counterclaim

On February 9, 2024, the Hammond Defendants filed an Answer to EDGAR's Complaint, and Hammond Software concurrently filed a Counterclaim against EDGAR, the ACBL, Mr. Platnick, Mr. Baseggio, and Mr. Stephani. (Doc. 25). In its Counterclaim, Hammond Software alleges that "ACBL's members have repeatedly

sought to misappropriate Hammond Software's valuable intellectual property and, in the case of EDGAR, have misused their ACBL positions to improperly deploy Hammond Software's technology for their own benefit." (*Id.* at 2, ¶ 1).

The Hammond Defendants have a lengthy relationship with the ACBL. (Doc. 25 at 2–6, ¶¶ 2–11). In 2012, Hammond Software contracted with the ACBL for a new scoring program. (*Id.* at 2, ¶ 2). The contractual relationship led to copyright ownership disagreements. (*Id.*) After the contractual agreement expired, the ACBL "repeatedly impeded" the use of Hammond Software's new and improved scoring program at many bridge events. (*Id.* at 3, ¶ 3). Hammond Software continued to develop its bridge software and eventually developed the software for which it applied for the Patents-In-Suit. (*Id.* at 3, ¶ 4). The Hammond Defendants claim that in 2021, Mr. Stephani, an ACBL Board Member and Chair of the ACBL's Appeals and Charges Committee, sought out Mr. Hammond to ask how Hammond Software's program worked, including the data files used to prosecute cases of cheating. (*Id.* at 3–4, ¶ 5). Mr. Hammond provided the information, and Mr. Stephani asked Hammond Software for a proposal to the ACBL board, which Mr. Hammond delivered in January 2022. (*Id.*) Mr. Stephani then used the proposal to create EDGAR, "which was the only proposal presented to the ACBL board in early 2022." (*Id.*) Mr. Platnick, a then-ACBL investigator/prosecutor, also asked Mr. Hammond for the same data and never divulged that he was working on the competing product. (*Id.* at 4, ¶ 6).

Negotiations and discussions regarding Hammond Software's cheating detection software have been ongoing since 2023. (Doc. 25 at 5, ¶¶ 8–9). Regardless, Hammond

Software claims that the ACBL announced that "it ha[d] joined forces with the EDGAR Association" and that "[t]he integration of EDGAR's resources into [their] operations w[ould] begin on February 1, 2024." (*Id.* at 30, ¶ 32). Hammond Software alleges that "Counterclaim-Defendants are making extensive use of Hammond Software's patented inventions," and thus, it requests damages to compensate for the infringement of the '912 Patent,[1] treble damages for the willful and deliberate infringement, attorney's fees and costs, and a permanent injunction. (*Id.* at 31, ¶ 35). The Counterclaim solely relates to the infringement of the '912 Patent. (*Id.* at 31–36, ¶¶ 36–46).

On April 15, 2024, EDGAR moved to dismiss Hammond Software's Counterclaim and moved for judgment on the pleadings as to its claim for declaratory judgment of invalidity of the Patents-In-Suit. (Doc. 52).[2] On May 29, 2025, the Court heard oral arguments from the parties. (Doc. 84).

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and a motion

---

[1] Hammond Software relies solely on the '912 Patent in its Counterclaim because both patents share "a substantially identical specification." (Doc. 60 at 8). The '912 Patent "is a continuation of and claims priority to [the '005 Patent]" and incorporates the '005 Patent by reference in its entirety. (Doc. 1-3 at 12).

[2] Neither party has requested claim construction. The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017). Thus, claim construction is not an "inviolable prerequisite" to the Court's decision. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183 (Fed. Cir. 2020) ("[The party] has not identified a single claim term that it believes requires construction before the eligibility of [the] claim [ ] can be decided, much less how this construction could affect the analysis.").

for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) are analyzed using the same legal standard and "should not be granted unless the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Losey v. Warden*, 521 F. App'x 717, 719 (11th Cir. 2013) (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2004)) (citation modified). Indeed, a complaint should be dismissed only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); FED. R. CIV. P. 12(b)(6).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, a claim will survive a motion to dismiss and a motion for judgment on the pleadings if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, at this stage, "all well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citation omitted). Courts are not required, however, to accept as true legal conclusions "couched" as factual allegations. *Twombly*, 550 U.S. at 555 (citation omitted).

Under 35 U.S.C. § 101, patent eligibility can be determined at the motion to dismiss stage "where the undisputed facts, considered under the standards required by [Rule 12(b)(6)], require a holding of ineligibility under the substantive standards of law." *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (2024) (citation

modified); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). "Eligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020). On a motion to dismiss based on patent ineligibility, courts may consider the complaint, the patent, and any materials subject to judicial notice. *Aatrix Software, Inc.*, 882 F.3d at 1128.

## DISCUSSION

EDGAR's motions rest entirely on the validity of the Patents-In-Suit and rely on 35 U.S.C. § 101. (Doc. 1 at ¶¶ 34–39, 53).[3] "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. But, "this provision contains an important implicit exception: laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). "Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Id.*

To determine whether the claims at issue are patentable, the Court engages in a two-step process, introduced by the Supreme Court in *Alice Corporation Party Limited v. CLS Bank International*. First, the Court must determine whether the at-issue claims are directed to an ineligible concept, like an abstract idea. *Id.* If so, then

---

[3] EDGAR also relies on 35 U.S.C. §§ 102, 103, 112(a) in its Complaint, but the entirety of its motion to dismiss relies on § 101. (Doc. 1 at ¶¶ 40–42, 54–56).

8

the Court must "consider the elements of each claim individually and as an ordered combination to determine whether the additional elements *transform* the nature of the claim into a patent-eligible application"—namely, whether the concept is "inventive." *Id.* (emphasis added); *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016). Each step is distinct and not to be conflated. *See Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1369 (2024).

As a preliminary matter, the Court considers Claim 10 representative of the other claims in the Patents-In-Suit. (*See* Doc. 52-1 at 10) ("Claim 10 . . . is representative of all independent claims of the Hammond Patents."). There is no need to analyze every claim in the Patents-In-Suit where all of the claims are substantially similar and linked to the same abstract idea, as is the case here. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014); *Valjakka v. Netflix, Inc.*, No. 22-cv-01490-JST, 2023 WL 5420225, at *2 (N.D. Cal. Aug. 22, 2023). And, although Hammond Software stated, without explanation, during oral argument that it did not concede that Claim 10 is representative, it treated the claim as representative in its briefing and did not point to any other claims that should have been differentiated from Claim 10. (*See* Doc. 60 at 18, 20, 23, 25); *see Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) ("Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim[.]").

9

### A. Step One of the *Alice* Analysis

#### 1. The Abstract Test

"Under *Alice* step one, we consider whether the claims at issue are directed to patent-ineligible subject matter, here, an abstract idea. This inquiry does more than simply ask whether the claims involve a patent-ineligible concept." *AI Visualize, Inc.*, 97 F.4th at 1378 (citation modified). Instead, we must look to the focus and the character of the claims as a whole to determine whether they are "directed to" patent-ineligible subject matter. *Id.*; *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). "Functions that humans have always performed, including collecting, analyzing, and displaying data, have repeatedly been held to be directed to an abstract idea." *Content Extraction & Transmission LLC*, 776 F.3d at 1347 (citation modified); *Caselas, LLC v. VeriFone, Inc.*, 624 F. Supp. 3d 1328, 1341 (N.D. Ga. 2022) (citing *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019)) ("The Federal Circuit Court of Appeals has "consistently held that . . . claims reciting the collection, transfer, and publishing of data are directed to an abstract idea."). "Merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *SAP Am., Inc.*, 898 F.3d at 1167 (citation modified) (affirming that methods for performing statistical analysis of investment information were not patentable because the focus of the claims was on selecting information, analyzing it using math, and displaying the results, which was all abstract).

2.  Hammond's Patents are directed to an abstract idea.

The Patents-In-Suit are directed to an abstract idea—specifically, the abstract idea of "gathering and analyzing information" and "merely presenting the results." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1091–97 (Fed. Cir. 2016) (finding a method for detecting fraud and misuse in user access to sensitive information by recording data, analyzing it using a rule, and providing a notification if misuse is detected, was patent-ineligible). The Patents-In-Suit cover a "method" comprised of (1) acquiring information, (2) determining value using the information, (3) detecting deviations in the information, and (4) alerting an administrator of such deviations. (Doc. 1-3 at 22). In essence, the patents cover "nothing but a series of mathematical calculations based on selected information and the presentation of the results of those calculations," similar to claims found non-patentable by the Federal Circuit in *SAP America, Inc. v. InvestPic, LLC*. Hammond Software's argument that "the '912 Patent is not directed to an abstract idea, but rather claims a technical solution necessarily rooted in computer technology" is not consistent with Federal Circuit precedent.

In *SAP America, Inc.*, the Federal Circuit affirmed judgment on the pleadings that all claims under a patent for "systems and methods for performing certain statistical analyses of investment information" were ineligible under § 101. 898 F.3d at 1163. The technique at issue "utilize[d] resampled statistical methods for the analysis of financial data." *Id.* at 1164 (describing multiple methods). The Federal Circuit affirmed that a method "for providing statistical analysis of investment data

over an information network" by storing, receiving, and performing data analysis was patent-ineligible and was merely "an advance in mathematical techniques in finance." *Id.* at 1165, 1167, 1170.

Here, like in *SAP America, Inc.*, while the Patents-in-Suit involve a similar advance for detecting cheating in bridge, the focus of the claims is on selecting certain information about player performance, analyzing it using mathematical techniques, and reporting the results of the analysis—"That is all abstract." *See id.* at 1167. Cases where mathematical techniques are used to improve something require more. *See, e.g., id.* ("And 'merely presenting the results of abstract processes of collection and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis.'"); *Osseo Imaging, LLC v. Carestream Dental LLC*, No. 1:23-cv-03115-LMM, 2024 WL 5329866, at *3 (N.D. Ga. Oct. 17, 2024) (claims were not abstract because the patents described "a system—using particular physical components—for" improving "existing dental imaging technology by showing a patient's bone density").

The Hammond Defendants rely on three cases they argue are more analogous to their patents and show their techniques are not abstract ideas—*CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020), *SRI International, Inc. v. Cisco, Systems, Inc.*, 930 F.3d 1295 (Fed. Cir. 2019), and *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). (Doc. 60 at 15–22). Each of these cases is distinguishable from the case at hand. In *CardioNet, LLC*, the patent's claims were "drawn to a device for detecting and reporting the presence of atrial fibrillation

or atrial flutter in a patient." 955 F.3d at 1364. The device detected the timing of cardiac activity and the presence of irregular beating, achieving multiple technological improvements. *Id.* at 1364, 1368. The *CardioNet* patent is materially different from the Patents-in-Suit because it described a *physical* device that did not "merely collect electronic information, display information, or embody mental processes." *Id.* at 1365–66, 1371. Rather, the *CardioNet* patent was not abstract because it was not "directed to a result or effect that [was] itself the abstract idea," merely invoking generic machinery, but acted as an improvement in computers as tools. *Id.* at 1368, 1371. This "result or effect" that the *CardioNet* court deemed insufficient is exactly what the Patents-in-Suit in the instant case describe—not a physical, technological improvement, but a statistical model that is solely abstract, and solely uses generic machinery.

The patents in *McRo, Inc.* were also significantly different. 837 F.3d 1299 (Fed. Cir. 2016). The patents in *McRo* utilized a set of rules to improve existing 3-D technology—it was the "incorporation of the claimed rules, not the use of the computer, that 'improved the existing technological process' by allowing the automation of further tasks." *Id.* at 314–15. The patents did not monopolize an overarching statistical analysis but left open the possibility of the invention of other approaches to automating lip synchronization using other rules. *Id.* The Patents-in-Suit in the instant case do the opposite. As *McRo, Inc.* clarifies, "mathematical formulas are a type of abstract idea," and "the abstract idea exception prevents patenting a result where it matters not by what process or machinery the result is

accomplished." *Id.* at 1312 (citation modified).

Lastly, *SRI International, Inc.* is clearly distinguishable. 903 F.3d 1295 (Fed. Cir. 2019). The patent in *SRI International*, which utilized a system to detect computer hackers, "improv[ed] the functionality of computers and computer networks themselves," rather than "using computers as tools" to solve a problem. *Id.* at 1304. In the instant case, the Patents-in-Suit undoubtedly do the latter—the claims rely on computers simply as a tool to carry out the claimed statistical analysis. They do not improve how the computer itself functions. In *SRI International, Inc.*, the claims "actually prevent the normal, expected operation of a conventional computer network." *Id.* The Patents-in-Suit instead benefit from a computer's normal operation. Thus, the Hammond Defendants' reliance on these cases is unpersuasive.

Moreover, the newness of the method is not relevant to a determination of abstractness. "No matter how much of an advance in the [ ] field the claims recite, [if] the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm," then the alleged technology is not patentable. *SAP Am., Inc.*, 898 F.3d at 1167. "Courts may assume that the techniques claimed are groundbreaking, innovative, or even brilliant, but that is not enough for patent eligibility." *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183 (Fed. Cir. 2020). The Hammond Defendants have, undoubtedly, developed a method of cheating detection that is new and, probably, brilliant. But because that method is focused on the collection of board data and data analysis of that data, it is abstract. *See Elec. Power Grp.*, 830 F.3d at 1351, 1354 (finding claims for "systems

and methods for performing real-time performance monitoring of electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results" was not patent eligible); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a *new* abstract idea is still an abstract idea.") (citation modified) (emphasis in original).

### B. Step Two of the *Alice* Analysis

#### 1. The Inventive Concept Test

Under *Alice*, an abstract idea can still be patentable if it is inventive. If the particular elements of the claim, considered "both individually and 'as an ordered combination,' 'transform the nature of the claim' into a patent-eligible application," then the claim is sufficient. *Alice*, 573 U.S. at 217. While the first step of the *Alice* test looks at the "focus" of the claims and their "character as a whole," the "second-stage inquiry (when reached) looks more precisely at what the claim elements *add*—specifically, whether, in the Supreme Court's terms, they identify an inventive concept in the application of the ineligible matter to which (by assumption at stage two) the claim is directed." *Elec. Power Grp., LLC*, 830 F.3d at 1353 (citation modified).

"The mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Content Extraction & Transmission LLC*, 776 F.3d at 1348 (citation modified). "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than the performance of well-understood, routine, conventional activities previously known to the industry." *Id.* at 1347–48. Claims that

"improve an existing technological process are sufficient to transform the process into an inventive application of the patent-ineligible concept." *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016). In a process claim, "[a] new combination of steps . . . may be patentable even though all the constituents . . . were well known and in common use[.]" *Id.*; *see also Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010). But a "patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." *Bascom Glob. Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).

### 2. The Hammond Patents are not inventive concepts.

Here, the Patents-In-Suit rely on the use of generic computers and processes in the implementation of the claimed method. The method does not require unique gear or specialized machinery to work—all that is required is "the processor" and a "computer-readable medium." (*See* Doc. 1-3 at 16, 22) ("A server can be any processor-equipped device," including a cell phone or a laptop). And, the claimed method does not directly improve computer technology. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016) (patent involved a "specific improvement to the way computers operate"). Thus, the question is whether the patented method involves the performance of "well-understood, routine, conventional" activities, or whether the method relies on a new means of determining cheating in bridge that transforms the abstract concept of the patent into a sufficient inventive concept.

"An invocation of already-available computers that are not themselves

plausibly asserted to be an advance, for use in carrying out improved mathematical calculations, amounts to a recitation of what is 'well-understood, routine, and conventional.'" *SAP Am., Inc.*, 898 F.3d at 1167. Indeed, the '912 Patent admits that its statistical determinations are based on a theory that applies in other fields. (*See* Doc 1-3 at 17) ("This field of mathematical probability and statistics is well-understood. . . . Scientists use a similar method for randomness in reporting results."). And, the calculations are dependent on sources that are not special or unique to Hammond Software, relying on information such as the players, the table, the hand record, the final contract, and the declarer. (*Id.*) In other words, the Patents-In-Suit do not create *new* data that was previously unattainable. The technique measures and collects *existing* data and applies a formula to determine whether a player is cheating. *But see Osseo Imaging, LLC*, 2024 WL 5329866, at *3 (finding the patent was sufficient because it described a system, using physical components to create a tomographic model, that "did more than convert existing data to a new, digital format").

Importantly, "patent protection does not extend to claims that monopolize the building blocks of human ingenuity." *Berkheimer*, 881 F.3d at 1366 (citation modified). Indeed, a "claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Alice*, 573 U.S. at 221. Here, the Patents-In-Suit fall short of this requirement because the Hammond Defendants seek to protect statistical analysis pulled from theories used in other fields and using information commonly collected (and, seemingly accessible to others outside of Hammond Software). Such protection would monopolize

17

statistical analysis in determining cheating in bridge and potentially other card games. Thus, the Patents-In-Suit's claims, specified at a "high level of generality," are not enough to be inventive. *Elec. Commc'n Techs., LLC*, 958 F.3d at 1183.

Hammond Software argues that "[t]he improvements recited by the claims have no pre-electronic analog." (Doc. 25 at ¶ 23). But, the non-existence of a "pre-electronic analog" is not dispositive—merely advancing from a manual method to a computerized method is insufficient. *See Chewy, Inc. v. Int'l Bus. Machines Corp.*, 94 F.4th 1354, 1365 (Fed. Cir. 2024) (We have repeatedly held "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer [does not] provide a sufficient inventive concept."). Hammond Software also argues that "the claimed technologies of the '912 patent cannot be performed as mental steps by a human, nor by a human using a pen and paper due the sheer number and complexity of [the] data." (Doc. 25 at ¶ 23). But, even "in viewing the facts in [Hammond Software's favor], the inability for the human mind to perform each claim step does not alone confer patentability." *See FairWarning IP, LLC*, 839 F.3d at 1098. Efficiency with a computer "does not materially alter the patent eligibility." *Id.*

Hammond Software also argues that the patented method includes an inventive concept because of its applicability to all bridge games, including those online, which was not previously possible with the use of the old method, where players could be observed. "Online bridge games, in particular, introduce unique challenges such as, for example, opportunities for collusion among players without an ability to inspect the players' physical actions or spoken words. The claimed

invention of the '912 patent provides a unique technical solution for detecting such behavior." (Doc. 25 at ¶ 24). But, Hammond Software's "unique technical solution" is more comparable to the patents rejected by the Federal Circuit than those methods deemed valid. *Compare SAP Am., Inc.,* 898 F.3d at 1167–70, 830 F.3d at 1353 (finding statistical analysis method not patentable) *and FairWarning IP, LLC*, 839 F.3d at 1093–97 (finding statistical analysis method not patentable because it was "nothing more" than collecting, analyzing, and displaying data) *with McRO, Inc.*, 837 F.3d at 1314–16 (finding method to be a valid patent when it improved a physical device) *and CardioNet, LLC*, 955 F.3d at 1364 (finding method to be a valid patent when it improved cardiac monitoring technology). Here, the Hammond Defendants have taken a manual, tedious process of observations and assigned those observations values that can be analyzed by a computer.

Hammond Software's reliance on *Rapid Litigation Management Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016) is inapposite. The claims in *CellzDirect* describe a "new and improved technique" for cryopreservation of a type of liver cell with multiple medical and research uses. Prior to the new technique, scientists would freeze the cells at frigid temperatures, then thaw the cells and recover the cells that survive using "density gradient fractionation," and prevailing wisdom was that cells could only be frozen once. *Id.* at 1045. But the inventors in *CellzDirect* discovered a method of freezing the cells multiple times "without unacceptable loss of viability." *Id.* Hammond Software argues that its patents are similar—that the "combination, as a whole, involves an inventive step because the

19

claimed invention . . . provides a new and useful solution" (Doc. 60 at 28).

But *CellzDirect* also draws a distinction between claims that are "simply an observation or detection of" an abstract idea and claims that are "directed to a new and useful method" of doing something. 827 F.3d at 1048–49. In *CellzDirect*, the claim was directed at a new method of preserving liver cells; here the claims are directed at a method for *detecting or observing* cheating in bridge. *See id.* (discussing the difference between cases where the end result is a method of detection or observation of a natural phenomenon, and a new method for production of more useful liver cells). "[T]he end result of the process [of the Patents-in-Suit], the essence of the whole, [is] a patent-ineligible concept" because "it amount[s] to nothing more than observing or identifying the ineligible concept itself." *See id.* at 1048; *SAP Am., Inc.*, 898 F.3d at 1168 ("[T]he focus of the claims is not a physical-realm improvement but an improvement in wholly abstract ideas[.]"). The entirety of the patent relies on the application of a known mathematical equation (abstract) to a set of known data (abstract) to display more data (still abstract).

Finally, although the U.S. Patent and Trademark Office ("PTO") found the patent to be a valid, patentable invention, this Court is not bound to agree.[4] Rather, the PTO's determination is insightful, but not dispositive. *See Caselas, LLC*, 624 F. Supp. 3d at 1342 (citing *Cleveland Clinic Found. v. True Health Diagnostics LLC*,

---

[4] During oral argument, Hammond Software pointed to its communications with the USPTO and provided a portion of such communications in its visual presentation, but it did not provide those documents to the Court for consideration in response to the instant motions.

760 F. App'x 1013, 1020 (Fed. Cir. 2019)) ("The Court is not bound by the PTO's guidance, particularly in light of recent Supreme Court and Federal Circuit guidance on this point.") (citation modified). For the reasons discussed herein, the Patents-In-Suit are invalid. And, without a valid patent, there can be no infringement. *Caselas, LLC*, 624 F. Supp. 3d at 1343 (dismissing patent infringement claims after determining patents at issue were invalid).

CONCLUSION

Accordingly, EDGAR's Motion to Dismiss Hammond Software's Counterclaim on the '912 Patent (Doc. 52) is **GRANTED**, and Hammond Software's Counterclaim (Doc. 25) is **DISMISSED** with prejudice. EDGAR's Motion for Judgment on the Pleadings on its claim for declaratory judgment (Doc. 52) is **GRANTED**. The Court **DECLARES** that the Patents-in-Suit—the '005 Patent and the '912 Patent—are invalid. The Court further **DECLARES** that the EDGAR technology does not infringe and has not infringed any enforceable claim of the '005 Patent or the '912 Patent. Because this Order resolves all of EDGAR's claims at issue in this action, the Clerk is **DIRECTED** to enter judgment in favor of Plaintiff The EDGAR Association and against Defendants Hammond Software, Inc. and Nicolas Hammond. The Clerk is further **DIRECTED** to **CLOSE** this case.

SO ORDERED, this 11th day of September, 2025.

_____
TIFFANY R. JOHNSON
United States District Judge